**KAYE SCHOLER LLP**
Richard G. Smolev (RS-2222)
Howard Kleinhendler (HK-5712)
425 Park Avenue
New York, NY 10022
*Attorneys for the Official Committee*
*of Unsecured Creditors of TL*
*Administration Corp., et al.*

**KING & SPALDING LLP**
Franklin Ciaccio (FC-7024)
1185 Avenue of the Americas
New York, NY 10036-4003
*Attorneys for U.S. Bank National*
*Association, as Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| TL ADMINISTRATION CORPORATION, *et al.*, | Case No. 03-15564 (CB) |
| Debtors. | (Jointly Administered) |

_____ /

| | |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TL ADMINISTRATION CORPORATION, *et al.* (f/k/a TWINLAB CORPORATION, *et al.*) on behalf of the ESTATES OF TL ADMINISTRATION CORPORATION, *et al.* and U.S. BANK NATIONAL ASSOCIATION, as Trustee Under that Certain Indenture, Dated May 7, 1996 : : : : : : : : : : : | Adversary Proceeding No. 04-02334 (CB) (Procedurally Consolidated with Adv. Pro. No. 04-2323 (CB)) |
| Plaintiffs, : : | |
| v. : | **AMENDED COMPLAINT** |
| BRIAN BLECHMAN, ROBIN BLECHMAN, DEAN BLECHMAN, SHARON BLECHMAN, NEIL BLECHMAN, HELENA BLECHMAN, ROSS BLECHMAN, LINDA BLECHMAN, STEVE BLECHMAN, ELYSE BLECHMAN, JOHN DANHAKL, LEONARD SCHUTZMAN, JONATHAN SOKOLOFF and WILLIAM U. WESTERFIELD, : : : : : : : : : : : | |
| Defendants. : | |

_____ /

The Official Committee of Unsecured Creditors of TL Administration

Corporation (f/k/a Twinlab Corporation) ("TLC"), TL Administration, Inc. (f/k/a Twin

Laboratories, Inc.) ("TLI"), and TL Administration (UK), Ltd. (f/k/a Twin Laboratories (UK),

Ltd.) ("TLUK") (the "Committee"), on behalf of the Estates of TLC, TLI and TLUK (TLC, TLI

and TLUK are collectively referred to as "TLC" or the "Company" or the "Debtors"), by its

undersigned attorneys, and U.S. Bank National Association, as trustee (the "Trustee") under that

certain indenture, dated May 7, 1996 (the "Indenture"), governing the issuance by TLI of

$100,000,000 10.25% Senior Subordinated Notes due 2006 (the holders of the securities issued

under the Indenture are referred to as "Noteholders"), allege as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this adversary proceeding pursuant to 11 U.S.C. §§ 105

and 510(c) to, among other things, recharacterize as a contribution of equity or, in the alternative,

to equitably subordinate the claims of Ross, Steve, Brian, Neil and Dean Blechman (the

"Blechmans") and their wives, Linda, Elyse, Robin, Helena and Sharon Blechman (the "Wives"),

in connection with a $15 million letter of credit posted by the Blechmans and the Wives in April

of 2001 (the "L/C"), pursuant to a Reimbursement Agreement and Pledge of Assets (as defined

below) by the Company to the Blechmans and Wives, to secure a line of credit extended to the

Company by The CIT Group/Business Credit, Inc. ("CIT").

2.      With respect to Plaintiffs' equitable subordination claims and

recharacterization and avoidance claims, this is a core proceeding pursuant to 28 U.S.C. §§

157(2)(F), (K), and (O).  With respect to the remaining claims, this adversary proceeding is a

non-core proceeding but is "otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1).

2

30876801.DOC

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a), 1334(b), 1367(a), and the General Order of Reference entered in the Southern District of New York.

4.      Venue of this adversary proceeding in this District is proper, pursuant to 28 U.S.C. § 1409(a), because TLC's case, as consolidated, is pending in this District.

## THE PARTIES

5.      On or about September 4, 2003 (the "Filing Date"), TLC and its subsidiaries filed a voluntary petition ("Chapter 11 Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 101, *et seq.*, in this Court.

6.      TLC is a Delaware corporation with a principal place of business at 150 Motor Parkway Suite 210 Hauppauge, NY 11788.

7.      TLI is a Utah corporation with a principal place of business at 150 Motor Parkway Suite 210 Hauppauge, NY 11788.

8.      TLUK is incorporated under the laws of Great Britain with a principal place of business at 150 Motor Parkway Suite 210 Hauppauge, NY 11788.

9.      Before the Filing, at all relevant times, the Board of Directors of TLI and TLUK were comprised of directors who were also directors of TLC.  Ross Blechman was CEO and President of TLC, TLI and TLUK.  Ross Blechman was CEO and President of all subsidiaries and affiliates of TLI.

3

10.     Plaintiff U.S. Bank National Association is a national banking association organized under the laws of the United States and has a principal place of business in St. Paul, Minnesota.

11.     Defendant Brian Blechman was a member of the TLC and TLI Board of Directors (collectively, the "Board") between 1996 and the Filing Date.  He resides at 6 Pine Point Lloyd Harbor, NY 11743.

12.     Defendant Robin Blechman is the wife of Brian Blechman, and has been his wife from 1996 to the present.  She resides at 6 Pine Point Lloyd Harbor, NY 11743.

13.     Defendant Dean Blechman was a Director on the Board ("Director") between 1996 and the Filing Date.  He resides at 4 Stone Gate Court, Setauket, NY 11733.

14.     Defendant Sharon Blechman is the wife of Dean Blechman, and has been his wife from 1996 to the present.  She resides at 4 Stone Gate Court Setauket, NY 11733.

15.     Defendant Neil Blechman was a Director between 1996 and the Filing Date.  He resides at 30 Setalcott Place, Setauket, NY 11733.

16.     Defendant Helena Blechman is the wife of Neil Blechman, and has been his wife from 1996 to the present.  She resides at 30 Setalcott Place, Setauket, NY 11733.

17.     Defendant Ross Blechman was a Director between 1996 and the Filing Date.  He resides at 41 Setalcott Place Setauket, NY 11733.

18.     Defendant Linda Blechman is the wife of Ross Blechman, and has been his wife between 1996 and the present.  She resides at 41 Setalcott Place, Setauket, NY 11733.

19.     Defendant Steve Blechman was a Director between 1996 and the Filing Date.  He resides at 11 White Pine Lane Poquott, NY 11788.

4

20.     Defendant Elyse Blechman is the wife of Steve Blechman, and has been his wife between 1996 and the present date.  She resides at 11 White Pine Lane Poquott, NY 11788.

21.     Defendant John Danhakl ("Danhakl") is a former Director who resides in California and is a managing partner at Leonard Green & Partners, L.P. ("LGP" or "Leonard Green").  His business address is Leonard Green & Partners, L.P., 11111 Santa Monica Boulevard Suite 2000 Los Angeles, CA 90025.

22.     Defendant Leonard Schutzman is a former Director who resides at 5 Darien Close Darien, Connecticut 06820-4737.

23.     Defendant Jonathan Sokoloff ("Sokoloff") is a former Director who resides in California and is a managing partner at LGP.  His business address is Leonard Green & Partners, L.P., 11111 Santa Monica Boulevard Suite 2000 Los Angeles, CA 90025.

24.     Defendant William U. Westerfield is a former Director who resides at 134 Silvermist Court, Little Silver, New Jersey 07739.

25.     At all relevant times, each of the defendants was an "insider" of TLC within the scope of 11 U.S.C. § 101(31)(B)(i), (ii), and/or (vi) by virtue of his or her position as either a Director or a relative of a Director.  Moreover, between 1996 and the Filing Date, the Blechmans collectively owned more than 25% of the outstanding common shares of TLC stock.

26.     Defendants Sokoloff, Danhakl, Schutzman and Westerfield are collectively referred to as the "Other Directors."

30876801.DOC

## FACTS

27.     In 1968, David and Jean Blechman started Twin Laboratories, Inc. ("Old Twin").  During the 1970s, David and Jean's sons, Brian, Neil, Ross, Steve and Dean, joined Old Twin, the family business.

28.     In 1995, David Blechman, nearing retirement age, decided to sell Old Twin over the strenuous objection of his five sons who, as young men, wanted to remain in the business.  Dean Witter was hired in 1995 to sell Old Twin but could not find a willing buyer.

29.     In 1996, John Danhakl, a former managing director of Donaldson, Lufkin & Jenrette, who had followed Old Twin for years and who was now a partner at merchant bank LGP in Los Angeles, contacted Ross Blechman.  Over the next several months, LGP put together a management-led leveraged buyout that netted the Blechmans $212.5 million and left an otherwise financially-sound company undercapitalized and saddled with nearly $147 million of debt.

### The Blechmans Pocket $212 Million

30.     Old Twin, a subchapter S corporation, had the following as its affiliates: Twinlab Export Corporation, Twinlab Specialty Corporation, Alvita Products, Inc., Natur-Pharma, Inc., B. Bros. Realty Corporation, and Advanced Research Press, Inc. (the "Affiliates"). As of December 31, 1995, Old Twin had $75.3 million in net assets and $19.9 million in liabilities, of which $5.3 million constituted long term debt.  Shareholder equity stood at $55.4 million; net income was $30.2 million; and net sales were $148.7 million.

31.     On or about February 27, 1996, TLC was incorporated in Delaware.

6

30876801.DOC

32.     On or about May 7, 1996, pursuant to a Stock Purchase and Sale Agreement, dated March 5, 1996, TLC acquired all of the common stock of Twin Laboratories, Inc. and the Affiliates from the Blechmans and their parents for $212.5 million cash (the "Acquisition").  TLC funded the Acquisition as follows:

a.     Green Equity Investors II ("GEI"), a fund wholly-owned and managed by LGP, purchased: (1) 48% of TLC's common stock for $4.8 million; and (2) shares of TLC redeemable preferred stock for $37 million.

b.     A second investor group acquired redeemable preferred shares for $30 million.

c.     TLC entered into a $53 million revolving credit facility with a bank group administered by Chase Manhattan Bank ("Chase").  The facility was set to run until May 7, 2002.

d.     TLC, through TLI, issued $100 million in 10.25% restricted subordinated notes, pursuant to the Indenture, to Donaldson, Lufkin & Jenrette and Chase Securities, Inc.

33.     The Acquisition left TLC over-leveraged and in a substantially weakened financial condition.  By September 30, 1996, TLC had net assets of $143.4 million, net liabilities of $171.1 million and long term debt of $148 million.  Shareholder equity was *negative* $94.7 million (including the $67 million in preferred shares outstanding).

34.     As part of the Acquisition, GEI and the Blechmans entered into a Stockholders' Agreement, which, among other things, provided that GEI would vote its common

7

shares for nomination of the five Blechmans to the TLC Board and that the Blechmans would

vote their common stock for the appointment of three Directors from GEI. TLC's Certificate of

Incorporation and corporate by-laws required the appointment of a minimum of eight directors to

the Board.

35.     At all times between the Acquisition and the Filing Date, the Company's

Certificate of Incorporation and by-laws required that all Board decisions be approved by a

majority of the members of the Board. After the Acquisition, the Board was comprised of the

five Blechmans and LGP representatives John Danhakl, Jonathan Sokoloff and Jennifer Holden

Dunbar.

36.     From the moment Messrs. Danhakl and Sokoloff joined the Board until

April of 2003, when they were not re-nominated as directors, Messrs. Danhakl and Sokoloff (the

"LGP Directors") were effectively under the domination and control of the Blechmans and

subservient to their wishes. The Blechmans initially determined the election of the LGP

Directors to the Board, and the presence and service of the LGP Directors on the Board was

dependent upon the continuing goodwill of the Blechmans, who controlled the Company and

who provided lucrative consulting contracts to LGP.

37.     Between 1996 and October 1999, Danhakl and Sokoloff were members of

the Company's Audit Committee. Ross Blechman was Chairman of the Board, President, and

Chief Executive Officer, and the remaining Blechmans were all executive vice presidents

("EVPs"). Brian Blechman was EVP of Quality Control and Facility Management. Dean

Blechman was EVP of Sales and Distribution. Neil Blechman was EVP of Marketing and

8

Advertising.  Steve Blechman was EVP of Advanced Research Press, Inc. ("ARP"), TLC's

publishing arm, which published a bodybuilding magazine and books related to fitness.

38.    The Company paid LGP $1 million for its services in structuring the

Acquisition.  The Company also entered into a consulting and management agreement with LGP

for $400,000 a year, plus reasonable expenses.  The management agreement continued through

1998.

39.    As part of the Acquisition, the Blechmans, acting in their capacity as

senior officers and Directors, caused the Company to execute employment contracts with each of

the Blechman brothers.  As part of their employment contracts, each Blechman brother received a

cash payment in return for his agreement not to compete with the Company.  The non-compete

agreement payments to the Blechmans totaled $15.3 million.  The purpose of the non-compete

agreements was to permit the Blechmans to shelter from taxes a portion of the $212.5 million

payment they received from the Acquisition.  Upon information and belief, the Blechmans would

have continued to work for the Company without non-compete agreements.

40.    The Blechmans' employment agreements ran to the end of 1999, provided

for the Blechmans to each receive $400,000 per year in base salary, and provided for a bonus

payment up to 128% of base salary, contingent on annual increases in TLC's earnings before

interest, taxes, depreciation, and amortization ("EBITDA").  For 1996, TLC paid each of the

Blechmans $403,077 in salaried compensation and $324,950 in bonus compensation.

### The Indenture

41.    In September 1996, the Company exchanged the $100 million in restricted

subordinated notes that was part of the Acquisition for $100 million in 10.25% unrestricted

9

subordinated notes.  Under section 4.12 of the Indenture, the Company could not create any lien, other than certain permitted liens, to secure any indebtedness, other than certain senior debt, upon its assets unless the Company and each of its subsidiaries equally and ratably secured the securities issued under the Indenture.  Further, the Indenture prohibited liens in favor of directors, such as the Blechmans, unless the securities issued under the Indenture were equally and ratably secured.

42.     Under section 4.13 of the Indenture, the Company could not sell any assets unless the proceeds of the asset sale were used to purchase new assets, for capital expenditures, or to permanently reduce senior debt.  Further, to the extent asset sale proceeds were used to permanently reduce senior debt and the proceeds exceeded such debt reduction, the excess proceeds had to have been used to offer to repurchase the securities under the Indenture.  Further, section 4.13 provided that the Company's Board of Directors was to determine in good faith that, for all asset sales which exceed $500,000, the Company received fair market value.

43.     Section 6.5 of the Indenture permits the Trustee to prosecute claims on behalf of the Noteholders.

44.     Section 13.8 of the Indenture provides that the Indenture is governed by New York law.

## The IPO Leaves Twinlab Undercapitalized

45.     In November of 1996, TLC completed an initial public offering of 8.5 million shares, netting $93.7 million.  With these funds, TLC redeemed the $67 million of outstanding preferred shares (plus accrued interest) sold as part of the Acquisition and paid down approximately $20 million of the Chase credit facility.

10

30876801.DOC

46.     After the public offering, TLC's net assets were $132 million, and its net liabilities were $136.5 million.

47.     The public offering diluted the common share holdings of GEI and the Blechmans (formerly 48% and 45%, respectively) to 32.9% and 30.5%, respectively.

48.     By the end of 1996, TLC was still undercapitalized.  For the year ending December 31, 1996, TLC's net income was $11.8 million; its net sales were $170.1 million; its net assets were $141.5 million; its net liabilities were $139.8 million; and shareholder equity stood at $1.7 million.  The Company's capital structure did not provide sufficient cash flow to enable the business to account for difficulties that were likely to arise, including interest rate fluctuations and general economic downturns, and to otherwise incorporate some margin for error.

49.     After a lengthy search, the Company hired John McCusker in November 1997 as its first Chief Financial Officer.

### TLC's Secondary Offering and Its Expansion of Product Lines and Production Facilities

50.     Beginning in 1997, the Company began to acquire assets to expand its product lines.  On or about November 12, 1997, the Company purchased Changes International, Inc., a network marketer of nutritional supplements, for 312,500 shares of its common stock (valued at $5.8 million) and an additional $7.9 million in cash.

51.     On or about April 4, 1998, TLC completed a secondary offering of 8 million shares, which sold on the open market for approximately $36.50 per share.

11

Approximately half of the 8 million shares were sold by TLC, and the remaining shares were sold by GEI.  After the offering, the number of common shares outstanding was 31.3 million.

52.    TLC received $147.5 million from the secondary offering that it used to:

a.    purchase, for $56.1 million in cash, the Bronson Division of Jones Medical Industries, Inc., a manufacturer and marketer of vitamins, herbs, beauty aids, and nutritional supplements that operated through the use of catalogs and direct mailings, and Health Factors, Inc., a manufacturer of vitamin supplements;

b.    redeem, for $40.4 million, $35 million of previously issued, senior subordinated notes at a redemption price of 109.5%, plus accrued and unpaid interest;

c.    pay down $9.9 million of the Chase credit facility; and

d.    apply $41.4 million toward working capital.

53.    GEI sold approximately 3.6 million shares in the secondary offering, thereby netting $131 million.  This reduced GEI's equity holdings from 30% to approximately 15.5% of the Company's outstanding stock.  LGP, through its control of GEI, decided to sell half its position in the Company because at the time it believed that the Blechmans were mismanaging the Company and that revenues were likely to decline sharply.  Indeed, on October 26, 1999, at a meeting of the Board of Directors, Jonathan Sokoloff suggested that "executives of the Company other than the [Blechman] brothers make presentations to the Board in their respective areas of responsibility from time to time at future Board meetings."  Upon information and belief, Messrs. Danhakl and Sokoloff used confidential information about the Company they

12

30876801.DOC

obtained as Directors of TLC to advise GEI to sell its shares in the secondary offering. The information concerning the Blechmans' mismanagement of the Company was not known, nor could have been known, to the Committee until it commenced its investigation in this case in September 2003. Notably, the prospectus for the secondary offering, dated April 8, 1998, stated: "The Company believes that its continued success depends to a significant extent on the management and other skills of Brian Blechman, Dean Blechman, Neil Blechman, Ross Blechman and Steve Blechman (the "Blechman Brothers"), as well as its ability to retain other key employees and to attract skilled personnel in the future to manage the growth of the Company. The loss or unavailability of the services of one or more of the Blechman Brothers could have a material adverse effect on the Company." The LGP Directors knew that this information was false.

54.     On or about August 21, 1998, TLC purchased PR*Nutrition, a manufacturer of nutritional food bars, for 1,150,000 shares of TLC common stock, valued at $39.7 million on the date of purchase.

55.     During the first half of 1998, TLC invested heavily in upgrading its production facilities to produce an herbal product called St. John's Wort in order to service the demand of Wal-Mart stores, which had contracted with the Company to supply its private label of this herb. However, by the second half of 1998, demand for St. John's Wort had declined dramatically, and the Company was left with overstocked inventory and untapped production capacity.

13

## Earnings Begin to Decline Sharply

56.     Toward the middle of 1999, the Company began searching for independent Directors.  On or about July 3, 1999, Robert S. Apatoff, Senior Vice President of Corporate Marketing at Aetna, Inc., and Defendant William U. Westerfield, a former audit partner at PricewaterhouseCoopers, were elected to the Board of Directors and the Audit Committee.

57.     On or about August 8, 1999, Royal Numico, N.V., a Netherlands manufacturer of dietary and nutritional supplements and TLC's largest competitor, announced an agreement to purchase General Nutrition Centers, Inc. ("GNC"), one of TLC's largest retail customers, for $1.83 billion.

58.     Faced with declining revenues and excess capacity and inventory, in August 1999, the Company dismissed its CFO, John McCusker, and hired John Bolt, a former senior executive with the Kellogg Company.

59.     For the year ending on December 31, 1999, TLC posted a net loss of $5.2 million on net sales of $315.6 million, representing a $17.7 million decrease in sales from 1998. TLC's assets stood at $286.2 million, compared to $290 million in 1998.  Its liabilities had increased to $122.7 million, a $38.2 million increase from 1998.

60.     Despite the losses of 1999, on or about January 1, 2000, TLC entered into new, three-year term employment agreements with all of the Blechmans except for Brian Blechman.  These agreements were renewable automatically for two years, unless prior notice was given to the contrary.  The contracts provided for non-compete payments that, upon information and belief, served as tax shelters rather than as true incentives to motivate the Blechmans to work for the Company.  Under the agreements, Neil, Steve and Dean Blechman

14

were to receive $450,000 per year as base salary, while Ross was to receive $550,000 a year as base salary.  Brian Blechman remained an "at will" employee of the Company, collecting a yearly salary of $450,000.  At the time the employment agreements were renewed, the Blechmans owned more than 25% of the Company's outstanding stock and collectively represented half of the Board of Directors.  Thus, no Board resolution could be passed without at least one of the Blechmans' consent.  The employment agreements also provided for severance payments of regular salary plus any pro rata bonus through the end of the term of the employment agreement.

61.     The members of TLC's Compensation Committee in 1999 who recommended that the Board approve the Blechman employment agreements were Directors Danhakl, Sokoloff and Ross Blechman.

## Chase Terminates TLC's Credit Facility

62.     The decline in sales and revenues caused TLC to default under the financial covenants of its credit facility with Chase.  Faced with a growing liquidity shortfall, the Company began negotiating with Chase to restructure the credit facility to provide for decreased financial performance and lower EBITDA.  At the same time, the Company began negotiating with other lenders to replace the Chase facility.  LGP partner John Danhakl approached representatives of CIT on behalf of the Company to explore the possibility of replacing the Chase credit line.

63.     In 2000, Chase engaged bankruptcy counsel to analyze the feasibility of continuing to provide financing to the Company if the Company were to reorganize under chapter 11 of the Bankruptcy Code.

30876801.DOC

64.     In November 2000, TLC released its third quarter earnings and announced a $16 million reduction to its herbal inventory balances, of which $3 million was attributable to 1998 and $1 million to 1999. The inventory restatements caused the Company to restate its net income for 1998 and 1999 downward by $1.4 million and $0.6 million, respectively.

65.     The 2000 third quarter SEC10-Q also reported a net income loss of $11 million for the quarter.

66.     While the Company reported that the 1998 and 1999 restatements were not material, investors were not persuaded. On or about November 21, 2000, Moody's Investors Service downgraded TLC's stock, "cautioning about a danger of default." As a result of the announcement, TLC's share price fell from $5.25 per share to $1.66 per share between the end of October and the end of November of 2000.

67.     On or about November 30, 2000, Robert Apatoff resigned from the TLC Board.

68.     The Company's mounting operating losses and inventory restatements caused increased strain between the Company and Chase. Although Chase agreed to forbear on the Company's defaults under its credit facility for a short period, Chase informed the Company that certain lenders participating in its credit facility would not continue to forbear and that the Company had to find replacement financing. By December 2000, Chase had reduced its facility to $47 million, of which $44 million had already been borrowed by the Company. With only $3 million of cash at its disposal, the Company desperately needed a new lender.

69.     But, the Company's financial condition at the end of 2000 was poor. The Company posted a $51 million loss for the year. GNC, which had accounted for 13% of 2000 net

16

sales, had announced that it would purchase significantly less product from TLC in 2001. The Company could no longer attract a traditional cash-flow based lender and instead sought an asset-based lender.

70.     Moreover, by 2000, the Company's sales began to rely increasingly on products containing herbal substances that had been alleged to have caused injury. The related potential product liability from the sale of these products became a substantial threat to the continued viability of the Company.

71.     By early 2001, CIT emerged as the only lender willing to lend to the Company. Like Chase, CIT also considered providing financing to the Company while the Company reorganized under the bankruptcy laws. Toward the end of 2000 and into early 2001, CFO Bolt, Director Westerfield and Ross Blechman seriously considered and discussed recommending to the Board that TLC file for bankruptcy protection.

### The Blechman Letter of Credit

72.     With the Company's business in steady decline and an imminent bankruptcy filing a real possibility, CIT would not agree to provide any financing to the Company without the Blechmans personally guaranteeing a portion of any credit line.

73.     The Blechmans met CIT's demand and agreed to secure a $15 million irrevocable letter of credit in favor of CIT. On March 29, 2001, CIT executed a $60 million revolving credit line to the Company for a three-year term. Ross and Dean Blechman guaranteed $15 million of the revolving credit line to CIT with $20 million of their own stock until April 12, 2001. On or about April 12, 2001, the Blechmans and the Wives replaced the guarantee from

Ross and Dean with a $15 million L/C placed with Citibank, N.A. in favor of CIT.  ("Irrevocable Letter of Credit No. NY-02728-30029658").

74.    At about the same time the Blechmans and the Wives agreed to post the L/C, the Company purportedly agreed to reimburse the Blechmans and the Wives should CIT draw on all or part of the L/C (the "Reimbursement Agreement" dated on or about April 10, 2001).  The Company pledged all of its assets, subject to a first lien by CIT, to collateralize the Reimbursement Agreement (the "Pledge of Assets").  The Company's full Board never deliberated upon whether to approve the Reimbursement Agreement or the Pledge of Assets. Upon information and belief, the Board never approved the Reimbursement Agreement or Pledge of Assets in accordance with law.  The Blechmans improperly recorded Uniform Commercial Code ("UCC") financing statements related to the Reimbursement Agreement and the Pledge of Assets.

75.    Upon information and belief, the Wives had no substantial income or assets of their own.  The assets the Wives pledged to support the L/C were held in joint accounts with their husbands and were amassed from the efforts and incomes of their husbands.  The Wives were designated signatories on the L/C in an artificial effort to enhance the so-called secured position of the Blechmans under the Reimbursement Agreement and thereby frustrate the rights of the Company's creditors.  Notably, in the CIT Financing Agreement, dated March 29, 2001, only the Blechmans were obligated to collateralize the L/C, not the Wives.  Furthermore, in an Indemnification Agreement, dated April 10, 2001, between the Blechmans and the Wives related to their collateralization of the L/C, each Blechman husband and wife is treated as a single entity (defined as a "Blechman Couple") with respect to their indemnification obligations.

18

30876801.DOC

In its second section, the Indemnification Agreement explicitly provides that the indemnification obligations of each Blechman Couple are the joint and several obligations of each Blechman Couple member.  Further, upon information and belief, the Wives were added as signatories to the L/C as part of an estate plan to benefit the Blechmans and their families.

76.     Messrs. Danhakl and Sokoloff knew about the purported Reimbursement Agreement and Pledge of Assets to the Blechmans but never investigated whether the Reimbursement Agreement or Pledge of Assets were necessary to convince the Blechmans and Wives to post the L/C.  Mr. Westerfield was never consulted about the need for a Reimbursement Agreement or a Pledge of Assets nor did he carefully consider or deliberate over the terms of those agreements.

77.     Upon information and belief, in 2001, the Blechmans and the Wives were desperate to keep the Company out of bankruptcy and would have posted the L/C even if the Reimbursement Agreement had not been secured by a lien on the Company's assets.

78.     Without the CIT line of credit, the Company would not have been able to stay in business any longer.  Putting the Company into bankruptcy at that time and obtaining debtor-in-possession financing would have benefited the Company's creditors but harmed the Blechmans.  Causes of action related to the 1996 Acquisition would have been preserved for the Company's creditors.  The assumption of the Blechman employment contracts would have been subject to judicial scrutiny, thereby exposing the non-compete payments to creditor review and opposition.  By posting the L/C, the Blechmans prevented creditors from examining either the Acquisition or the employment contracts.

30876801.DOC

79.     Keeping the Company from filing for bankruptcy also helped Messrs. Danhakl and Sokoloff delay creditor review of the GEI sale of stock in the secondary offering. Keeping the Company from filing for bankruptcy also prevented creditors from challenging lucrative consulting payments by the Company to LGP.  As partners of LGP, Messrs Danhakl and Sokoloff personally benefited from these gains.

80.     At the time the Blechmans and the Wives agreed to post the L/C, the Company was undercapitalized.

81.     At the time the Blechmans and the Wives agreed to post the L/C, the Company was unable to meet its debts as they came due.

82.     At the time the Blechmans and the Wives agreed to post the L/C, the Company was in the vicinity of insolvency.

83.     The term of the L/C was three years.  Further, under the terms of the L/C, the Blechmans and the Wives could reduce the amount of the L/C by up to $11,500,000 if the Company's EBITDA and inventory levels exceeded certain predetermined levels.

84.     The Reimbursement Agreement and Pledge of Assets violated the Indenture because the Company did not cause the securities issued under the Indenture to be equally and ratably secured with liens granted to the Blechmans and the Wives under the Reimbursement Agreement and Pledge of Assets.

85.     Although they would have posted the L/C without compensation, the Blechmans used the delivery of the L/C as another vehicle to siphon cash from the Company. After a study was done by Ernst & Young to justify and value the compensation for securing the

L/C, the Company agreed to pay the Blechmans collective compensation of $375,000 and 375,000 shares of treasury stock per year for each year that the L/C was outstanding.

### TLC Sells Assets

86.     Shortly after the CIT credit facility was put in place, the Company defaulted on its financial covenants. To induce CIT not to declare a default on its credit facility, and to maintain their grip over the Company, the Blechmans caused the Company to begin selling valuable assets at a fraction of their original cost.

87.     On or about April 17, 2001, the Company sold Changes International, Inc. and substantially all of the assets of PR*Nutrition, Inc. to Goldshield Group, PLC for approximately $4.4 million and $600,000, respectively. These businesses were originally purchased in 1998 for $13.7 million and $39.7 million, respectively. The Company did not obtain a fairness opinion from an independent consultant with regard to either of these asset sales. The Company did not engage an investment banker to attempt to sell these assets at fair market value.

88.     Upon information and belief, the sales of Changes International and PR*Nutrition violated section 4.13 of the Indenture because the proceeds from these sales were not used to purchase new assets, for capital expenditures or to permanently reduce senior debt. Furthermore, the proceeds from these sales were not offered to repurchase the securities issued under the Indenture.

89.     The sales of Changes International and PR*Nutrition violated the Indenture because the Board of Directors did not act in good faith and with diligence to determine that the Company received fair market value for the sale of either asset.

21

90.     On or about May 22, 2001, Defendant Leonard Schutzman, CEO of NearWare Networks, Inc. and former senior executive of PepsiCo, Inc., was elected to TLC's Board of Directors and became a member of TLC's Audit Committee.

91.     On or about June 1, 2001, TLC sold ARP, its profitable publishing division, to Steve Blechman for $1 million.  Financial consultant Berkery Noyes & Co. provided a fairness opinion for the transaction.  At the same time, Steve Blechman resigned as Executive Vice President and shortly thereafter received a $900,000 non-compete payment from the Company.  Steve Blechman remained a Director on the Board.

92.     Upon information and belief, the sale of ARP violated section 4.13 of the Indenture because the proceeds from the sale were not used to purchase new assets, for capital expenditures or to permanently reduce senior debt.  Furthermore, the proceeds from this sale was not offered to repurchase the securities issued under the Indenture.

93.     In August 2001, the Company fired CFO John Bolt and hired Joseph Sinicropi as CFO.

94.     In September 2001, CIT waived the Company's defaults under the credit facility.

95.     On October 31, 2001, Ross Blechman met with Dean Blechman.  Ross complained that Dean had not been contributing to the Company for the past three years and was incompetent to serve on either the Company's executive committee, of which he was a member, or as an executive vice president.  The next day, Dean asked to be bought out of his employment contract for $1.35 million.

30876801.DOC

96.    For the year ending December 31, 2001, the Company had lost $91.6 million.  Net sales were $199.8 million, down $80.5 million from 2000.  TLC's assets stood at $128.6 million, down from $248.2 million in 2000.  Its liabilities were $107.6 million. Shareholder equity was stated at $21 million.  GNC, which accounted for 9% of 2001 sales, announced that it would purchase significantly less product from TLC in 2002 versus 2001.

97.    Although Dean Blechman had been neglecting his corporate responsibilities for the past three years and Ross Blechman had decided to sharply curtail his executive functions, on December 31, 2001, Dean resigned from management and thereafter received approximately $1.3 million in severance and non-compete payments.  Dean Blechman remained on the TLC Board.

98.    In its SEC 10-K filing for the year, the Company announced that its 2002 liability insurance "(i) d[id] not cover legal defense costs (which were a covered expense under prior insurance programs); (ii) provide[d] significantly lower coverage limits and higher self-insured retentions; and (iii) require[d] the Company to pay higher premium costs, as compared to products liability insurance programs for prior periods."  With increasing exposure in potential product liability from sales of products containing certain herbal ingredients (*i.e.*, ephedra) that were alleged to cause injury, the loss of substantial insurance coverage threatened the viability of the Company as a going concern.  The Company's Directors failed to take necessary steps to protect the Company from increased exposure to uninsured product liability claims.  Instead of curtailing sales of the products containing the allegedly dangerous herbal ingredients, the Company steadily became more reliant on sales of these products.  At the same time, it reduced

23

30876801.DOC

its ability to increase sales in other areas by selling off valuable divisions, such as Changes, PR

Nutrition, Health Factors and Bronson Laboratories, Inc.

99.     By year-end 2001, 21% of the Company's net sales were derived from the

sale of products containing certain herbal ingredients that were alleged to cause injury.

### 2002 — Losses Continue to Mount

100.     Toward the end of 2001, the Company interviewed several financial

consultants to present a plan to assist the Company to reorganize.  Options presented by financial

consultants Smith Barney and Murphy Noell were new financing, taking the company private, a

new equity investment or a sale of the company either outside or within a bankruptcy case.

Additionally, in or about December 2001, Deloitte & Touche Reorganization Services was

retained by the company to assist with inventory management.  Deloitte & Touche LLP has been

the Company's outside auditor since 1992.

101.     On or about March 13, 2002, Murphy Noell made a presentation to the

TLC Board of potential reorganization options.  Among the options suggested by Murphy Noell

was for the Company to file for bankruptcy and sell its assets under section 363 of the

Bankruptcy Code.  The Board rejected this idea and did not retain Murphy Noell to provide a

reorganization plan for the Company.  Instead, shortly thereafter, in April 2002, the Company

retained Peter Solomon & Company to advise on reorganization.

102.     The Company continued to lose money in 2002 and continued selling

valuable, profitable divisions to raise operating cash.  On or about May 22, 2002, TLC sold

Health Factors, a manufacturer of private label vitamins and health products, to Anabolic

Laboratories, Inc. for $2.1 million.  Projected EBIT for Health Factors in 2001 was $2.0 million.

The Company did not obtain a fairness opinion regarding the sale of Health Factors.  The Company did not engage an investment banker to attempt to sell these assets at fair market value.

103.    Upon information and belief, the sale of Health Factors violated section 4.13 of the Indenture because the proceeds from these sales were not used to purchase new assets, for capital expenditures or to permanently reduce senior debt.  Furthermore, the proceeds from this sale were not offered to repurchase the securities issued under the Indenture.

104.    On September 30, 2002, TLC reported its quarterly earnings.  The Company had lost $26 million in the quarter.  Net assets were $97.6 million and net liabilities were $102.4 million.  The Company was insolvent.

105.    On or about November 8, 2002, Brian and Neil Blechman were informed that the Company would not extend their employment because their services were not needed. At about that same date, both brothers resigned their management positions but remained on the Board.  On or shortly after November 8, 2002, the Company entered into severance agreements with Brian and Neil Blechman pursuant to which the Company was obligated to pay each of them severance and non-compete payments of at least $1,350,000 each.  These agreements were signed by Ross Blechman on behalf of the Company.

106.    Throughout 2002, CIT waived repeated defaults by the Company on its financial covenants and lowered the EBITDA the Company had to post in order to maintain the credit facility.

107.    For the year ending December 31, 2002, the Company lost $91.6 million on net sales of $146.6 million.  Sales had decreased $53.2 million from 2001.  TLC's net assets

30876801.DOC

were $97.2 million, compared to $128.6 million in December 2001.  Its net liabilities were $108.3 million.  Shareholder equity was *negative* $11.1 million.

108.    For the year ending 2002, 21% of the Company's sales were derived from the sale of products containing certain herbal ingredients that were alleged to cause injury.  In November 2002, the Company announced that it would cease all sales of products containing ephedra.  At the time, sales of products containing ephedra comprised 21% of the Company's annual net sales.

## The Sale of Bronson

109.    By the end of 2002, TLC was near financial collapse.  Losses were mounting, sales were declining, and the Company could not meet even the lowered EBITDA levels previously required by CIT.  Strapped for cash, in November 2002, the Board of Directors, including the Blechmans and the Other Directors, approved the sale of the Company's Bronson Laboratories division ("Bronson") for $5 million.

110.    The Blechmans and the Other Directors did not engage an investment banker to market Bronson in order to obtain fair market value.  The Blechmans and the Other Directors did not meaningfully consider the repercussions to the Company of selling Bronson, a profitable division with $2.2 million EBITDA in 2002.

111.    On or about January 17, 2003, TLC sold Bronson to Kabco Pharmaceuticals, Inc. for $8 million.  The Company did not obtain a fairness opinion from an independent consultant with regard to this transaction.  The Company paid $5 million from the sale to CIT, which in return amended the credit facility again and waived the Company's

financial covenant default.  Under the terms of this amendment, CIT lowered TLC's credit line to $45 million and adjusted EBITDA requirements further downward.

112.    In violation of section 4.13 of the Indenture, the Company did not use the remaining $3 million in proceeds from the Bronson sale to offer to repurchase securities issued under the Indenture.

113.    At the time the Company sold Bronson to Kabco for $8 million, the fair market value of Bronson was $16 million.

114.    In the latter part of April of 2003, the Company issued its 2003 proxy. Messrs. Danhakl, Sokoloff and Schutzman were not re-nominated as directors.

115.    At the end of June of 2003, the Company drafted its last financial statements.  For the second quarter of 2003, net sales were $37.24 million, and net income was negative $10.4 million.  TLC's assets stood at $91.5 million, while its liabilities stood at $116.54 million.  Shareholder equity was negative $25 million.

116.    On September 4, 2003, TLC declared bankruptcy by filing the Chapter 11 Petition in this Court.

117.    On or about December 19, 2003, CIT drew down on the full amount of the L/C.

30876801.DOC

## FIRST CLAIM FOR RELIEF

**Declaration Concerning the Legal Validity and Effect of the Reimbursement Agreement and Pledge of Assets Based Upon Disregard of Principles of Corporate Law (Against the Blechmans and the Wives)**

118.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 117 of this Complaint as if set forth fully herein.

119.    The Reimbursement Agreement and Pledge of Assets were never approved by the Board in accordance with the Company's by-laws, Delaware law, or Utah law.

120.    Because the Reimbursement Agreement and Pledge of Assets were never approved by the Board in accordance with law, they do not have legal force and effect, and any liens granted pursuant to the execution of these agreements are similarly tainted with illegality.

121.    The Blechmans and Wives have filed proofs of claim asserting that they are entitled to secured creditor status under the Reimbursement Agreement and Pledge of Assets, and a justiciable controversy exists as to the rights and remedies, if any, these documents convey to the Blechmans and the Wives.

122.    Consequently, this Court should find and declare that the Reimbursement Agreement, the Pledge of Assets, and any liens granted thereby, are void and of no legal effect.

30876801.DOC

## SECOND CLAIM FOR RELIEF

### Declaration Concerning the Legal Validity and Effect of the Reimbursement Agreement and Pledge of Assets Based Upon Breach of Indenture (Against the Blechmans and the Wives)

123.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 122 of this Complaint as if set forth fully herein.

124.    The Reimbursement Agreement and Pledge of Assets violated the Indenture because those agreements created indebtedness for a non-permitted lien that was not for senior debt (as defined in the Indenture), and the Company did not cause the securities issued under the Indenture to be equally and ratably secured with the liens granted to the Blechmans and the Wives under the Reimbursement Agreement and Pledge of Assets.

125.    The Blechmans and Wives have filed secured proofs of claim and assert that they are entitled to secured creditor status under the Reimbursement Agreement and Pledge of Assets.  A justiciable controversy exists as to the rights and remedies, if any, the Reimbursement Agreement and Pledge of Assets convey to the Blechmans and the Wives.

126.    The Noteholders cannot be made whole by the Company through money damages for its breach of the Indenture because the Company has limited assets which are subject to competing claims.

127.    Consequently, the Noteholders are entitled to specific performance of the provisions of the Indenture, and this Court should find and declare that the liens set forth in the Reimbursement Agreement and Pledge of Assets in favor of the Blechmans and the Wives should be subordinated to the level of those claims held by the Noteholders against the Debtors.

30876801.DOC

## THIRD CLAIM FOR RELIEF

### Declaration and Recharacterization from Debt to Equity
### (Against the Blechmans and the Wives)

128.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 127 of this Complaint as if set forth fully herein.

129.    On or about December 19, 2003, CIT drew on the L/C for the full amount of $15 million.  The Blechmans and the Wives seek to collect $15 million from the Company as secured creditors pursuant to the Reimbursement Agreement and Pledge of Assets.

130.    The Blechmans' and the Wives' posting of the L/C should not be considered as a secured loan to the Company or as participation in a secured loan to the Company, but should be recharacterized as an equity contribution because:

a.    There was no fixed rate of compensation for the L/C until a year after the L/C was posted;

b.    The Blechmans would have secured the L/C without any compensation or reimbursement from the Company;

c.    CIT would not have lent the Company any funds without the Blechmans' L/C, and without the CIT credit facility, the Company could not have paid its debts as they came due and would have gone out of business;

d.    At the time the Blechmans secured the L/C, the Company was undercapitalized—it did not have sufficient cash flow to account for difficulties that were likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for

30

error.  Alternatively, at the time the Blechmans secured the L/C, the Company was (i) insolvent or was about to become insolvent or (ii) was generally not paying its debts as they became due;

e.  The L/C was linked to the performance of the Company.  Under the terms of the L/C, had the Company realized sufficient EBITDA and maintained certain inventory levels, the Blechmans and the Wives could have substantially reduced the amount of the L/C;

f.  There was an identity of interest between the Blechmans in that they were creditors of the Company who collectively owned more than 25% of the outstanding common stock of the Company in April of 2001, the time the L/C was posted; and

g.  The Company could not have obtained acceptable financing in March 2001 from any disinterested lender without the L/C.

131.  In addition to recharacterizing the L/C transaction as a contribution to equity capital, this Court should also find and declare that the Reimbursement Agreement and Pledge of Assets are void and of no legal effect because, among other things, the Reimbursement Agreement and Pledge of Assets were signed, and the Blechmans and Wives filed UCC financing statements against TLC, without the Board's approval of the Reimbursement Agreement or the Pledge of Assets.

31

## FOURTH CLAIM FOR RELIEF

### Equitable Subordination, Section 510(c) of the Bankruptcy Code
### (Against the Blechmans and the Wives)

132.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 131 of this Complaint as if set forth fully herein.

133.     As set forth above, between 1996 and the Filing Date, the Blechmans and the Wives were "insiders" of TLC within the meaning of 11 U.S.C. § 101(31)(B)(i), (ii), and/or (vi).

134.     In connection with their status as directors or officers of TLC, the Blechmans exercised dominion and control over the business and financial affairs of TLC.

135.     By virtue of the foregoing, and by virtue of their insider status, the acts of the Blechmans and their Wives in obtaining the Reimbursement Agreement and Pledge of Assets from the Company are subject to close and rigorous scrutiny.

136.     As of March 2001, TLC was in the vicinity of insolvency.  As of that date, the Company's Directors and officers owed a fiduciary duty to all of TLC's creditors.  In breach of their fiduciary duties, the Blechmans, insiders with dominion and control over TLC's financial and operational affairs, engaged in inequitable conduct by using the L/C to, among other things:

> A.     maintain their grip over the Company through continued dominance of the Board and senior management and facilitate a way to obtain value for their vast common share holdings, which amounted to approximately 1.65 million shares of common stock

32

per each Blechman brother, or, cumulatively, approximately 26% of TLC's voting stock;

B.    engage in self-dealing by providing Defendants Dean, Brian and Neil Blechman each with $1.35 million in severance and non-compete payments;

C.    engage in self-dealing by providing Steve Blechman with a $900,000 non-compete payment and then—virtually simultaneously—selling him the profitable ARP division for only $100,000 more;

D.    delay the filing of bankruptcy, an event of default under the L/C, thereby deepening the insolvency of the Company in order to prevent CIT from drawing down on the L/C;

E.    induce the Company to incur more debt than it could support;

F.    enter into the Reimbursement Agreement and Pledge of Assets in violation of the Indenture;

G.    maintain control over the Company and direct the Company's response and settlement position with respect to various shareholder and other suits (such as those based on personal injury allegedly resulting from ingestion of the Company's products, or those based upon consumer fraud for improper labeling of the Company's products) against the Company that also name the

33

Blechmans personally as defendants in order to avoid personal liability arising from such lawsuits.

137.    These acts of inequitable conduct permitted the Blechmans and the Wives to gain an unfair advantage over unsecured creditors when the Company ultimately filed for bankruptcy protection and to enhance their position to the detriment of TLC's estates.

138.    Additionally, the Blechmans and Wives engaged in inequitable conduct by masking an infusion of capital as a secured loan at a time when the Company was undercapitalized in order to obtain an unfair advantage over creditors.

139.    Additionally, the Blechmans engaged in inequitable conduct by using the Company as their instrumentality by virtue of their control of the Board of Directors.  The full Board of Directors never deliberated upon the Reimbursement Agreement or the Pledge of Assets.  Instead, the Blechmans had the Reimbursement Agreement and the Pledge of Assets drafted for their own benefit and to obtain an unfair advantage over creditors.

140.    Moreover, the Blechmans used the Company as an instrumentality by selling Company assets for less than fair market value in order to forestall a bankruptcy filing. By selling Changes International, PR*Nutrition, ARP, Health Factors and Bronson Laboratories for less than fair market value, the Blechmans were able to quickly obtain desperately-needed cash to, among other things, forestall the Company's default under its financing agreement with CIT, which would have caused CIT to draw on the L/C.  Further, proceeds of asset sales enabled the Blechmans to delay putting the Company into bankruptcy, thereby ensuring that any fraudulent conveyance causes of action related to the 1996 Acquisition would be time-barred and beyond the scrutiny of creditors.

34

30876801.DOC

141.     All of the aforesaid inequitable conduct resulted in injury to the creditors through corporate waste, and by enabling the Blechmans to deepen the insolvency of the Company through, among other things, hasty, ill-advised asset sales that had an underlying ulterior motive to fund self-serving million dollar non-compete payments to themselves, thereby depriving the creditors of value from which to repay their claims.

142.     Equitable subordination under these circumstances is consistent with the provisions, purposes and policies of the Bankruptcy Code.

143.     Based on the foregoing, pursuant to 11 U.S.C. §§ 105 and 510(c), the Reimbursement Agreement and Pledge of Assets should be declared void, and the Company's obligations under the Reimbursement Agreement and Pledge of Assets should be subordinated to the level of equity, below the claims of TLC's unsecured creditors.

## FIFTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against the Blechmans and the Other Directors)

144.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 143 of this Complaint as if set forth fully herein.

145.     The Blechmans and the Other Directors owed fiduciary duties of care, loyalty and good faith to TLC, and to its creditors once TLC entered the vicinity of insolvency.

146.     Throughout their tenure on the Board, the Blechmans were interested directors by virtue of their stock holdings in the Company, their executive positions in the Company, and/or their self-dealing actions to steer to themselves millions of dollars in corporate funds through ill-gotten severance and non-compete payments.

35

30876801.DOC

147.    Throughout their tenure as board members, the LGP Directors were interested directors by virtue of their substantial stock holdings in the Company, LGP's consulting agreements with the Company, and their need to forestall a bankruptcy filing and prevent creditors from challenging GEI's windfall recovery from TLC's 1998 secondary offering. That recovery resulted, in material part, from disclosure by Messrs Danhakl and Sokoloff to GEI and LGP of non-public information concerning the Blechmans' gross mismanagement of the Company.

148.    The Blechmans and the Other Directors breached their duty of care to the Company and its creditors.

149.    The Blechmans and the Other Directors breached their duty of loyalty to the Company and its creditors.

150.    The Blechmans and Other Directors breached their duty of good faith to the Company and its creditors.

151.    Furthermore, from 2000 until the Filing Date, Ross Blechman, TLC's President and Chief Executive Officer from 1996 to the Filing Date, breached his duty of loyalty to TLC by engaging in a pattern of disloyal acts and inequitable conduct that included, among other things:

A.    repeatedly seeking waivers from lenders to prevent the Company from filing for bankruptcy protection in order to protect his gains and the gains of the other Blechmans in connection with the 1996 Acquisition;

36

B.    selling ARP to Steve Blechman for the insufficient net effective consideration of $100,000;

C.    selling TLC's assets—Changes International, Inc., PR*Nutrition, Inc., Health Factors, and Bronson Laboratories—at depressed prices, without first obtaining fairness opinions, in order to maintain a hold on the Board and senior management and to protect his equity investment in the Company;

D.    authorizing the Company's payment of large non-compete payments to Steve, Dean, Neil, and Brian Blechman, none of whom deserved, nor were entitled, to this compensation.

152.   For these breaches of fiduciary duty in his capacity as President and CEO of the Company, Ross Blechman should forfeit any compensation that he received from the Company between November 2000 to the Filing Date.

153.   The Debtors' estates have been damaged:

A.    by the conduct of the Blechmans and the Other Directors, in their capacity as directors, in an amount to be determined at trial, but not less than $50 million; and

B.    by the breaches of fiduciary duty of Ross Blechman, in his capacity as President and CEO of the Company, in an amount to be determined at trial, but not less than $1.5 million.

154.   In addition to awarding damages, this Court should find and declare that any security interests, liens, security agreements (such as the Pledge of Assets), or reimbursement

37

agreements (such as the Reimbursement Agreement) entered into by the Company, the

Blechmans, and the Wives that secure repayment of the L/C are void and of no legal effect. Such

a declaration will afford the Committee equitable relief from the conduct of the Blechmans and

the Other Directors.

## SIXTH CLAIM FOR RELIEF

### Avoidance of Insider Preference Under Section 547(b)
### (Against Neil Blechman and Brian Blechman)

155.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 154 of this Complaint as if set forth fully herein.

156.    Between November 8, 2002 and the Filing Date, the Company paid Brian

Blechman severance and non-compete payments of approximately $1.35 million.

157.    Between November 8, 2002 and the Filing Date, the Company paid Neil

Blechman severance and non-compete payments of approximately $1.35 million.

158.    Between November 8, 2002 and the Filing Date, Brian and Neil Blechman

were Directors of the Company and insiders.

159.    The Debtors filed for bankruptcy protection on September 4, 2003, less

than one year after the aforesaid payments were made.

160.    The aforesaid payments to Brian and Neil Blechman were on account of an

antecedent debt owed by TLC to Brian and Neil Blechman, and these payments were made at a

time when the Company was insolvent. Neither Brian nor Neil Blechman would have received

the $1.35 million payments had the Company been liquidated under Chapter 7 of the Bankruptcy

Code.

30876801.DOC

161.    Therefore, pursuant to Section 547(b) of the Bankruptcy Code, those payments should be avoided, and, pursuant to 11 U.S.C. § 550, Brian and Neil Blechman should be directed to return an amount equal to their severance and non-compete payments to the Debtors' estates.

## SEVENTH CLAIM FOR RELIEF

### Avoidance of Insider Preference Under Section 547(b)
### (Against the Blechmans and Wives)

162.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 161 of this Complaint as if set forth fully herein.

163.    Within one year prior to the Filing, the Company paid each of the Blechmans and Wives $37,500 and 37,500 shares of TLC treasury stock as compensation for their pledge of assets to secure the L/C.  The total payment to the Blechmans and Wives was $375,000 plus 375,000 shares of stock.

164.    At the time the Blechmans and the Wives received the aforesaid compensation, they were insiders of TLC.

165.    The aforesaid payments to the Blechmans and Wives were on account of an antecedent debt owed by TLC to them, and these payments were made at a time when the Company was insolvent.  None of the Blechmans or Wives would have received the aforesaid payments had the Company been liquidated under Chapter 7 of the Bankruptcy Code.

166.    Therefore, pursuant to Section 547(b) of the Bankruptcy Code, those payments should be avoided, and, pursuant to 11 U.S.C. § 550, the Blechmans and the Wives

should each be directed to return to the Debtors' estate an amount equal to $37,500 plus the equivalent of the fair market value of the 37,500 shares of TLC stock which they received.

## EIGHTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 548(a)(1)(A), (B)
### (Against Neil Blechman and Brian Blechman)

167.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 166 of this Complaint as if set forth fully herein.

168.    The severance and non-compete payments of up to approximately $1.35 million each to Neil and Brian Blechman were transfers made by the Company within one year of the Filing Date with actual intent to hinder, delay, or to defraud the Company's creditors on or after November 8, 2002.

169.    In the alternative, the severance and non-compete payments of up to $1.35 million each to Neil and Brian Blechman were transfers made by the Company within one year of the Filing Date for which the Company received less than reasonably equivalent value and i) were made when the Company was insolvent; or ii) were made while the Company was engaged or about to engage in business or a transaction for which the property remaining with the Company was an unreasonably small capital; or iii) were made when the Company intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

170.    Accordingly, pursuant to Sections 548(a)(1)(A) & (B) of the Bankruptcy Code, the $1.35 million severance and non-compete payments to Brian and Neil Blechman

30876801.DOC

should be avoided, and, pursuant to 11 U.S.C. § 550, these defendants should be directed to

return an amount equal to these payments to TLC's estates.

## NINTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 544(b)(1)
### (Against Steve, Dean, Neil, and Brian Blechman)

171.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 170 of this Complaint as if set forth fully herein.

172.    As stated above, Steve, Dean, Neil, and Brian Blechman received

severance and non-compete payments from the Company.  Steve received approximately

$900,000 and Brian, Neil and Dean received approximately $1.35 million each.

173.    Each of these payments were made by the Company at a time when the

Company was insolvent, and the Company did not receive fair consideration in exchange for

these payments.

174.    In the alternative, these payments placed the Company in a position where

it had unreasonably small capital for conducting its normal business.

175.    In the alternative, these payments were made at a time when the Company

intended to incur, or believed that it would incur, debts beyond its ability to pay them as they

matured.

176.    In the alternative, these payments were made with actual intent to hinder,

delay, or defraud creditors.

177.    Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and

sections 270-81 of New York's Debtor and Creditor Law, the severance and non-compete

30876801.DOC

payments to Steve, Neil, Brian and Dean Blechman should be avoided, and, pursuant to 11

U.S.C. § 550, these defendants should be directed to return an amount equal to these payments to

the Debtors' estates.

## TENTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 544(b)(1)
### (Against Steve Blechman)

178.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 177 of this Complaint as if set forth fully herein.

179.    The Company sold ARP to Steve Blechman on or about June 1, 2001, for

$1 million.  In connection with this transaction, the Company paid Steve Blechman a non-

compete payment of approximately $900,000.  Thus, the Company only netted approximately

$100,000 from the sale of ARP to Steve Blechman.

180.    The ARP transaction was conducted by the Company when it was

insolvent, and the Company did not receive fair consideration in exchange for its sale of ARP.

181.    In the alternative, the ARP transaction put the Company in a position

where it had unreasonably small capital for conducting its normal business.

182.    In the alternative, the ARP transaction was conducted at a time when the

Company intended to incur, or believed that it would incur, debts beyond its ability to pay them

as they matured.

183.    In the alternative, the ARP transaction was conducted with actual intent to

hinder, delay, or defraud creditors.

42

184.    Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor Law, the ARP transaction should be avoided, and, pursuant to 11 U.S.C. § 550, all agreements pertaining to that transaction should be declared null and void.  In addition, Steve Blechman should be directed to return an amount equal to the purchase price of ARP to the Debtors' estates.

## ELEVENTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 544(b)(1)
### (Against the Blechmans and the Wives )

185.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 184 of this Complaint as if set forth fully herein.

186.    As stated above, the Blechmans and the Wives received the Reimbursement Agreement and the Pledge of Assets from the Company, even though they would have originally posted the L/C had they not obtained these agreements.

187.    The Reimbursement Agreement and the Pledge of Assets were made by the Company at a time when the Company was insolvent, and the Company did not receive fair consideration in exchange for its granting of these agreements to the Blechmans and the Wives.

188.    In the alternative, the Reimbursement Agreement and the Pledge of Assets placed the Company in a position where it had unreasonably small capital for conducting its normal business.

189.    In the alternative, the Reimbursement Agreement and the Pledge of Assets were made at a time when the Company intended to incur, or believed that it would incur, debts beyond its ability to pay them as they matured.

190.     In the alternative, the Reimbursement Agreement and the Pledge of Assets were made with actual intent to hinder, delay, or defraud creditors.

191.     Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor Law, the Reimbursement Agreement and the Pledge of Assets, granted by the Company in favor of the Blechmans and the Wives, should be avoided, and this Court should declare that neither agreement is of any legal force or effect.  Such a declaration will serve to remove any encumbrances in favor of the Blechmans and the Wives upon the Company's assets and will restore at least some—if not all—of the value of these assets to the Company, thereby affording the Committee relief under 11 U.S.C. § 550.

### TWELFTH CLAIM FOR RELIEF

**Fraudulent Conveyance Under Section 548(a)(1)(A), (B)
(Against the Blechmans and the Wives)**

192.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 191 of this Complaint as if set forth fully herein.

193.     Compensation of $37,500 and 37,500 shares of TLC treasury stock paid by the Company to each of the Blechmans and Wives within one year of the Filing Date was done with actual intent to hinder, delay, or to defraud the Company's creditors.

194.     In the alternative, the above compensation to each of the Blechmans and Wives were transfers made by the Company within one year of the Filing Date for which the Company received less than reasonably equivalent value and i) were made when the Company was insolvent; or ii) were made while the Company was engaged or about to engage in business or a transaction for which the property remaining with the Company was an unreasonably small

44

capital; or iii) were made when the Company intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

195.   Accordingly, pursuant to Sections 548(a)(1)(A) & (B) of the Bankruptcy Code, the compensation payments of $37,500 and 37,500 shares of TLC common stock to each of the Blechmans and the Wives should be avoided, and, pursuant to 11 U.S.C. § 550, these defendants should be directed to return an amount equal to that compensation to TLC's estates.

## THIRTEENTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 544(b)(1)
### (Against the Blechmans and the Wives)

196.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 195 of this Complaint as if set forth fully herein.

197.   Between 2002 and 2003, compensation of $75,000 and 75,000 shares of TLC treasury stock was paid by the Company to each of the Blechmans and Wives.

198.   The above compensation was paid by the Company at a time when the Company was insolvent, and the Company did not receive fair consideration in exchange for its payment of the aforesaid compensation to the Blechmans and their Wives.

199.   In the alternative, the payment of the aforesaid compensation to the Blechmans and the Wives placed the Company in a position where it had unreasonably small capital for conducting its normal business.

200.   In the alternative, the payment of the aforesaid compensation to the Blechmans and the Wives was made at a time when the Company intended to incur, or believed that it would incur, debts beyond its ability to pay them as they matured.

30876801.DOC

201.    In the alternative, the payment of the aforesaid compensation to the Blechmans and the Wives was made with actual intent to hinder, delay, or defraud creditors.

202.    Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor law, the aforesaid compensation payments from the Company to each of the Blechmans and the Wives should be avoided, and, pursuant to 11 U.S.C. § 550, these defendants should be directed to return an amount equal to the aforesaid compensation to TLC's estates.

## FOURTEENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Dean, Neil, Steve and Brian Blechman)

203.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 202 of this Complaint as if set forth fully herein.

204.    The severance and non-compete payments contained in the employment agreements of Brian, Neil, Steve and Dean Blechman were without fair consideration because each of them would have worked at the Company without severance or non-compete payments. Indeed, by continuing as Directors of the Company after they left their managerial positions, Brian, Neil, Steve and Dean each would have been prevented from competing with the Company under common law principles of fiduciary duty imposed on corporate directors.

205.    Brian, Neil, Steve and Dean Blechman were unjustly enriched, to the detriment of TLC's estates, through their receipt of lucrative severance and non-compete payments from the Company.

30876801.DOC

206.     Brian, Steve, Neil and Dean Blechman were not entitled to the amount of severance and non-compete payments they received in light of the breaches of fiduciary duty they engaged in, as set forth above.  Their receipt of such payments violates fundamental principles of fairness and equity.

207.     The Debtors' estates have been damaged by the payments made to Brian, Neil, Steve and Dean Blechman in an amount to be determined at trial, but not less than $4,950,000.

208.     By reason of the foregoing, this Court should order Brian, Neil, Steve, and Dean Blechman to make restitution to the Debtors for the benefit of their estates in an amount to be determined at trial, but not less than $4,950,000.

**FIFTEENTH CLAIM FOR RELIEF**

**Deepening Insolvency**
**(Against the Blechmans and Defendants Danhakl and Sokoloff)**

209.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 208 of this Complaint as if set forth fully herein.

210.     The Blechmans and Directors Danhakl and Sokoloff used funds obtained from the CIT credit facility to forestall an inevitable bankruptcy filing that would have preserved the assets of TLC's estates and certain causes of action for creditors.

211.     Putting the Company into bankruptcy in March of 2001, when TLC was insolvent or, at the very least, in the vicinity of insolvency, and obtaining debtor-in-possession financing would have benefited the Company's creditors but harmed the Blechmans, Danhakl and Sokoloff in a number of material ways:

30876801.DOC

A.     First, causes of action rooted in fraudulent conveyance relating to the 1996
       Acquisition would have been preserved for the Company's creditors.

B.     Second, the assumption of the Blechman employment contracts would
       have been subject to judicial scrutiny, thereby exposing the non-compete
       payments to creditor review and opposition.

C.     Third, GEI's sale of approximately 3.6 million shares in the secondary
       offering in 1998 would have come under judicial and/or creditor scrutiny
       because Messrs. Danhakl and Sokoloff used confidential information
       about the Company they obtained as Directors of the Company to advise
       GEI to sell its shares.

D.     Fourth, lucrative payments made to LGP under its consulting agreements
       with the Company (in which Messrs. Danhakl and Sokoloff shared as LGP
       partners) would have been subject to judicial scrutiny, thereby exposing
       these payments to creditor review and opposition.

E.     Fifth, the Blechmans and Directors Danhakl and Sokoloff would not have
       been able to maintain their control of the Company so as to be in a
       position to shield themselves from personal liability as a result of product
       liability lawsuits filed against the Company.

212.   The conduct by the Blechmans and Directors Danhakl and Sokoloff
caused the Company to suffer substantial losses, to incur additional expenses related to repeated
amendments and waivers of the CIT credit facility, to further leverage the Company's already
over-leveraged capital structure, to sell profitable assets at below-market prices, to increase the

48

Company's dependence on the sale of products containing ephedra without adequate liability insurance to cover anticipated personal injury claims and, in general, to cause the Company to become more deeply insolvent, resulting in harm to the Committee.

213.    The Debtors' estates have been damaged by the foregoing conduct in an amount to be determined at trial, but not less than $50 million.

## SIXTEENTH CLAIM FOR RELIEF

**Equitable Subordination, Section 510(c) of the Bankruptcy Code
Breach of Indenture
(Against the Blechmans and the Wives)**

214.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 213 of this Complaint as if set forth fully herein.

215.    The Blechmans and the Wives were at all relevant times "insiders" of the Debtors within the meaning of 11 U.S.C. § 101(31)(B)(i), (ii), and/or (vi).

216.    In connection with their status as directors or officers of the Debtors, the Blechmans exercised dominion and control over the business and financial affairs of the Company and had knowledge or should have had knowledge of corporate agreements that related to the Company's assets and financial obligations to third parties.

217.    By virtue of the foregoing, and by virtue of their insider status, the acts of the Blechmans in obtaining the Reimbursement Agreement and Pledge of Assets from the Company are subject to close and rigorous scrutiny.

218.    As of March 2001, TLC was in the vicinity of insolvency.  As of that date, the Company's directors and officers owed a fiduciary duty to all of the Company's creditors.  In breach of their fiduciary duties to the Debtors and to creditors, the Blechmans, insiders with

49

30876801.DOC

dominion and control over the Debtors' financial and operational affairs, and the Wives engaged in inequitable conduct by:

A.    entering into the Reimbursement Agreement and Pledge of Assets with actual or constructive knowledge and/or actual or constructive intent that entering into such agreements would violate the Indenture's provisions and expose the Company to legal liability for this violation;

B.    entering into asset sales on behalf of the Company with actual or constructive knowledge and/or actual or constructive intent that entering into such transactions would violate the Indenture's provisions and expose the Company to legal liability for these violations;

C.    entering into the Reimbursement Agreement and Pledge of Assets with actual or constructive knowledge and/or actual or constructive intent that entering into such agreements would violate the Indenture's provisions and illegally place the Blechmans and the Wives ahead of the Noteholders in the event of a bankruptcy proceeding;

D.    refusing to take any steps, either prior to or after entering into the Reimbursement Agreement and Pledge of Assets, to remedy violation of the Indenture by granting to the Noteholders a lien

50

30876801.DOC

equal in status and priority with the lien obtained under the

Reimbursement Agreement and Pledge of Assets.

219.    These acts of inequitable conduct permitted the Blechmans and the Wives

to gain an unfair advantage over the Noteholders when the Company ultimately filed for

bankruptcy protection, and to enhance their position to the detriment of the Debtors' estates and

the Noteholders, thereby injuring these entities in the process.

220.    Upon information and belief, at all times relevant to this action, the Wives

were not acting as independent actors but as agents for their husbands or as their alter egos.

Consequently, under agency theory and other theories of law pertaining to imputation of liability,

the Blechmans' inequitable conduct should be imputed to the Wives as a matter of law.

221.    Equitable subordination under these circumstances is consistent with the

provisions, purposes and policies of the Bankruptcy Code.

222.    Based on the foregoing, pursuant to 11 U.S.C. §§ 105 and 510(c), the

Blechmans' and Wives' allegedly secured claims based upon the Reimbursement Agreement and

Pledge of Assets should be subordinated to equity, or alternatively, to the level of the claims of

the Noteholders against the Debtors' estates.

### SEVENTEENTH CLAIM FOR RELIEF

**Fraudulent Conveyance Under Section 544(b)(1)**
**Setting Aside the Blechman Employment Agreements**
**(Against the Blechmans)**

223.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1

through 222 of this Complaint as if set forth fully herein.

51

30876801.DOC

224.    On or about January 1, 2000, the Company executed employment agreements with Dean, Brian, Neil, Steve and Ross Blechman, and on January 1, 2001 with Brian Blechman (the "Employment Agreements").  Pursuant to those agreements, the Blechmans were granted the right to certain severance and non-compete payments after the termination of their employment.

225.    The Employment Agreements were made by the Company at a time when the Company was insolvent, and the Company did not receive fair consideration in exchange for its granting of these agreements.

226.    In the alternative, the Employment Agreements placed the Company in a position where it had unreasonably small capital for conducting its normal business.

227.    In the alternative, the Employment Agreements were made at a time when the Company intended to incur, or believed that it would incur, debts beyond its ability to pay them as they matured.

228.    In the alternative, the Employment Agreements were made with actual intent to hinder, delay, or defraud creditors.

229.    Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor Law, the Employment Agreements granted by the Company in favor of Ross, Dean, Neil, Steve and Brian Blechman should be avoided, and this Court should declare that none of the agreements is of any legal force or effect.

52

30876801.DOC

## EIGHTEENTH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 548(a)(1)(A), (B)
### Neil Blechman and Brian Blechman Separation Agreements
### (Against Neil and Brian Blechman)

230.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 229 of this Complaint as if set forth fully herein.

231.    On or about November 8, 2002, the Company entered into separation agreements with Brian and Neil Blechman (the "Separation Agreements").  Pursuant to those agreements, Neil and Brian Blechman were each granted certain severance and other benefits upon their termination of employment with the Company.  Additionally, pursuant to the Separation Agreements, the Company granted certain releases to Brian and Neil Blechman.

232.    The Debtors filed for bankruptcy protection on September 4, 2003, less than one year after the aforesaid Separation Agreements and releases were executed.

233.    The Separation Agreements and releases were entered into with actual intent to hinder, delay, or to defraud the Company's creditors.

234.    In the alternative, the Separation Agreements and releases were transfers made by the Company within one year of the Filing Date for which the Company received less than reasonably equivalent value and i) were made when the Company was insolvent; or ii) were made while the Company was engaged or about to engage in business or a transaction for which the property remaining with the Company was an unreasonably small capital; or iii) were made when the Company intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

53

30876801.DOC

235.     Accordingly, pursuant to Sections 548(a)(1)(A) & (B) of the Bankruptcy Code, the Separation Agreements and releases should be avoided and declared null and void and having no legal effect.

**NINETEENTH CLAIM FOR RELIEF**

**Fraudulent Conveyance Under Section 544(b)(1)**
**Neil Blechman and Brian Blechman Separation Agreements**
**(Against Neil and Brian Blechman)**

236.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 235 of this Complaint as if set forth fully herein.

237.     On or about November 8, 2002, the Company entered into Separation Agreements with Brian and Neil Blechman.  Pursuant to those agreements, Neil and Brian Blechman were each granted certain severance and other benefits upon their termination of employment with the Company.  Additionally, pursuant to the Separation Agreements, the Company granted certain releases to Brian and Neil Blechman.

238.     The Separation Agreements were made by the Company at a time when the Company was insolvent, and the Company did not receive fair consideration in exchange for its granting of these agreements.

239.     In the alternative, the Separation Agreements placed the Company in a position where it had unreasonably small capital for conducting its normal business.

240.     In the alternative, the Separation Agreements were made at a time when the Company intended to incur, or believed that it would incur, debts beyond its ability to pay them as they matured.

30876801.DOC

241.   In the alternative, the Separation Agreements were made with actual intent to hinder, delay, or defraud creditors.

242.   Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor Law, the Separation Agreements and releases granted by the Company in favor of Neil and Brian Blechman should be avoided, and this Court should declare that none of the agreements is of any legal force or effect.

## TWENTIETH CLAIM FOR RELIEF

### Fraudulent Conveyance Under Section 544(b)(1)
### (Dean Blechman Termination Agreement)
### (Against Dean Blechman)

243.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 242 of this Complaint as if set forth fully herein.

244.   On or about January 1, 2002, the Company entered into a termination agreement with Dean Blechman ("Termination Agreement").  Pursuant to that agreement, Dean Blechman was granted certain severance and other benefits upon his termination of employment with the Company.

245.   The Termination Agreement was made by the Company at a time when the Company was insolvent, and the Company did not receive fair consideration in exchange for its granting of this agreement.

246.   In the alternative, the Termination Agreement placed the Company in a position where it had unreasonably small capital for conducting its normal business.

30876801.DOC

247.    In the alternative, the Termination Agreement was made at a time when the Company intended to incur, or believed that it would incur, debts beyond its ability to pay them as they matured.

248.    In the alternative, the Termination Agreement was made with actual intent to hinder, delay, or defraud creditors.

249.    Consequently, pursuant to section 544(b)(1) of the Bankruptcy Code and sections 270-81 of New York's Debtor and Creditor Law, the Termination Agreement and payments thereunder in favor of Dean Blechman should be avoided, and this Court should declare that this agreement is not of any legal force or effect.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a)    On the First Claim for Relief, a declaration that the Reimbursement Agreement, the Pledge of Assets, and any liens granted pursuant to the execution of these agreements, are void and of no legal effect;

(b)    On the Second Claim for Relief, a declaration that the obligations set forth in the Reimbursement Agreement and Pledge of Assets in favor of the Blechmans and the Wives violate the Indenture, and a finding that the indebtedness to the Blechmans and Wives evidenced by the Reimbursement Agreement and Pledge of Assets should be subordinated to the claims of the Noteholders against the Debtors' estates;

(c)    On the Third Claim for Relief, recharacterizing the Blechmans' and Wives' position with regard to the L/C as equity and declaring that any security interests, liens, security agreements (such as the Pledge of Assets),

56

or reimbursement agreements (such as the Reimbursement Agreement) entered into by the Company, the Blechmans and the Wives to secure repayment to the Blechmans and the Wives should CIT draw on the L/C are void and of no legal effect;

(d)    On the Fourth Claim for Relief, equitably subordinating the Blechmans' and Wives' position with regard to the L/C to equity and declaring that any security interests, liens, security agreements (such as the Pledge of Assets), or reimbursement agreements (such as the Reimbursement Agreement) entered into by Company, the Blechmans, and the Wives that secure repayment of the L/C are void and of no legal effect;

(e)    On the Fifth Claim for Relief:

   i.    damages, jointly and severally, against the Blechmans and Other Directors, in an amount to be determined at trial, but not less than $50 million;

   ii.   a declaration that any compensation received by Ross Blechman between November of 2000 and the Filing Date should be forfeited to the Company;

   iii.  an award of damages against Ross Blechman in an amount to be determined at trial, but not less than $1.5 million; and

   iv.   a declaration that any security interests, liens, security agreements (such as the Pledge of Assets), or reimbursement agreements (such as the Reimbursement

57

30876801.DOC

Agreement) entered into by the Company, the Blechmans, and their wives that secure repayment of the L/C are void and of no legal effect;

(f)     On the Sixth Claim for Relief, avoidance of the severance and non-compete payments made to Brian and Neil Blechman, an award of damages against Brian Blechman in an amount to be determined at trial, but not less than $1,350,000, plus interest, and an award of damages against Neil Blechman in an amount to be determined at trial, but not less than $1,350,000, plus interest;

(g)     On the Seventh Claim for Relief, avoidance of the compensation paid by the Company to each of the Blechmans and Wives, and an award of damages severally against each of the Blechmans and the Wives in an amount to be determined at trial, but not less than $37,500 plus the fair market value on the date of conveyance of 37,500 shares of TLC stock, plus interest against each of them;

(h)     On the Eighth Claim for relief, avoidance of the severance and non-compete payments made to Brian and Neil Blechman, an award of damages against Brian Blechman in an amount to be determined at trial, but not less than $1,350,000, plus interest, and an award of damages against Neil Blechman in an amount to be determined at trial, but not less than $1,350,000, plus interest;

58

30876801.DOC

(i)      On the Ninth Claim for Relief, avoidance of the $1,350,000 severance and

non-compete payments each made to Brian, Neil, and Dean Blechman, an

award of damages severally against each of them in an amount to be

determined at trial, but not less than $1,350,000 each, plus interest,

avoidance of the $900,000 severance and non-compete payment made to

Steve Blechman, and damages against Steve Blechman in an amount to be

determined at trial, but not less than $900,000, plus interest;

(j)      On the Tenth Claim for Relief, avoidance of the sale of ARP to Steve

Blechman, and judgment against Steve Blechman in an amount to be

determined at trial, but not less than $900,000, plus interest;

(k)      On the Eleventh Claim for Relief, avoidance of the Reimbursement

Agreement and the Pledge of Assets, and a declaration that all rights and

remedies including, liens and encumbrances, granted to the Blechmans and

the Wives pursuant to those agreements are null and void and without

effect;

(l)      On the Twelfth Claim for Relief, avoidance of the compensation paid by

the Company to each of the Blechmans and Wives, and an award of

damages severally against each of the Blechmans and the Wives in an

amount to be determined at trial, but not less than $37,500 plus the fair

market value on the date of conveyance of 37,500 shares of TLC common

stock, plus interest against each of them;

59

(m)  On the Thirteenth Claim for Relief, avoidance of the compensation paid by the Company to each of the Blechmans and Wives, and an award of damages severally against each of the Blechmans and the Wives in an amount to be determined at trial, but not less than $75,000 plus the fair market value on the date of conveyance of 75,000 shares of TLC stock, plus interest against each of them;

(n)  On the Fourteenth Claim for Relief, an award of restitution against Brian, Dean and Neil Blechman in an amount to be determined at trial, but not less than $1,350,000 against each of them, plus interest, and an award of restitution against Steve Blechman in an amount to be determined at trial, but not less than $900,000, plus interest;

(o)  On the Fifteenth Claim for Relief, an award of damages against Brian, Steve, Neil, Ross, Dean and Steve Blechman and John Danhakl and Jonathan Sokoloff, all jointly and severally, in an amount to be determined at trial, but not less than $50,000,000, plus interest;

(p)  On the Sixteenth Claim for Relief, equitable subordination of the Blechmans' and Wives' allegedly secured claims against the Debtors' estates under the Reimbursement Agreement and Pledge of Assets to the level of equity, or alternatively, to the level of the claims of the Noteholders against the Debtors' estates;

30876801.DOC

(q)     On the Seventeenth Claim for Relief, avoidance of the Employment Agreements in favor of Ross, Dean, Neil, Steve and Brian Blechman, and a declaration that none of these agreements is of any legal force or effect;

(r)     On the Eighteenth Claim for Relief, avoidance of the Separation Agreements and releases in favor of Neil and Brian Blechman, and a declaration that none of these agreements is of any legal force or effect;

(s)     On the Nineteenth Claim for Relief, avoidance of the Separation Agreements and releases in favor of Neil and Brian Blechman, and a declaration that none of these agreements is of any legal force or effect;

(t)     On the Twentieth Claim for Relief, avoidance of the Termination Agreement in favor of Dean Blechman, and a declaration that this agreement is not of any legal force or effect;

(u)     For the costs of bringing this action, including reasonable attorneys' fees where provided for by applicable law;

61

(v)    And, granting the Plaintiffs whatever further or other relief the Court

deems necessary and proper.

Dated:  New York, New York
         May 7, 2004

KAYE SCHOLER LLP

By:    /s/ Richard G. Smolev

Richard G. Smolev (RS-2222)
Howard Kleinhendler (HK-5712)

425 Park Avenue
New York, NY 10022-3598
Tel.: (212) 836-8000
Fax: (212) 836-8689

*Attorneys for the Official Committee
of Unsecured Creditors of
TL Administration Corporation, et al. on
behalf of the Estates of TL
Administration Corporation, et al.*

KING & SPALDING LLP

By:    /s/ Franklin Ciaccio

Franklin Ciaccio (FC-7024)

1185 Avenue of the Americas
New York, NY 10036-4003
Tel:  (212) 556-2285
Fax:  (212) 556-2222

*Attorneys for U.S. Bank National
Association, as Trustee*

62

30876801.DOC